# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
May 8, 2013

Lyle W. Cayce
Clerk

No. 11-51073

In the Matter of: LOTHIAN OIL, INC.,

Debtor

---

ISRAEL GROSSMAN; LOTHIAN CASSIDY, L.L.C.; SHOSHANA TRUST; ANNA MEISHER PENSION PLAN; YG TRUST; ET AL.,

Appellants Cross-Appellees

v.

THE BELRIDGE GROUP, Consisting of: Peninsula Fund, L.P.; Peninsula Catalyst Fund, L.P., Peninsula Catalyst Fund (QP), L.P.; JVL Global Energy, L.P.; JVL Global Energy, (QP), L.P., Belridge Energy Advisors, L.P.; Navitas Fund, L.P.; and Paul B. Lloyd, Jr.; Michael Raleigh; Nawab Energy Partners, L.P.; LOTHIAN OIL, INC.; LOTHIAN OIL (USA) INC.; LOTHIAN OIL TEXAS I, INC.; LOTHIAN OIL TEXAS II, INC.; LOTHIAN OIL INVESTMENTS I, INC.; LOTHIAN OIL INVESTMENTS II, INC.; LEAD I JVGP, INC.,

Appellees Cross-Appellants

---

ANTI LOTHIAN BANKRUPTCY FRAUD COMMITTEE; ET AL.,

Appellants Cross-Appellees

v.

LOTHIAN OIL INC.,

Appellee Cross-Appellant

No. 11-51073

---

Appeals from the United States District Court
for the Western District of Texas
USDC 7:10-CV-111

---

Before KING, HIGGINBOTHAM, and CLEMENT, Circuit Judges.

KING, Circuit Judge:[*]

Appellants/Cross-Appellees—the Anti-Lothian Bankruptcy Fraud Committee, Israel Grossman, and other individuals and entities—challenge a bankruptcy court's order enjoining their prosecutions of two state-court actions. The bankruptcy court reasoned that the state-court actions violated the plan injunction in the bankruptcy proceeding of debtor Lothian Oil, Inc. and its related corporate entities. The bankruptcy court later entered a contempt judgment against Appellants/Cross-Appellees after finding that they had failed to comply with the court's injunction order. On appeal, the district court affirmed the injunction relating to the later of the two state-court actions, reversed the injunction relating to the earlier one, and reversed the contempt judgment. Appellants/Cross-Appellees appeal the district court's affirmance of the injunction of the later state-court action. Appellees/Cross-Appellants Belridge Group and the Lothian debtors appeal the reversal of the injunction of the earlier state-court action and the reversal of the contempt judgment. For the following reasons, we find that the bankruptcy court did not err in enjoining both state-court actions and imposing sanctions. We accordingly affirm in part and reverse in part the district court's decision. Further, we remand with instructions to clarify whether an isolated claim in the earlier state-court action can proceed.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 11-51073

## I.  BACKGROUND

### A.    Lothian Oil, Inc. Bankruptcy Proceeding

On June 13, 2007, Lothian Oil, Inc., and its associated corporate entities (collectively "Lothian") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.[1]   On the same day, Lothian filed motions to approve settlement agreements entered into with Appellee/Cross-Appellant Nawab Energy Partners, L.P. ("Nawab").   The settlements resulted from lawsuits initiated by Lothian to resolve disputes over certain Texas oil and gas properties known as the "Casselman," "Bohannon," "Foster," and "Cowden" properties, on which a group of creditor companies ("Belridge Group") sought to foreclose.[2]  A fifth property—the "Nobles" property—later was purchased by Nawab at a bankruptcy auction.   The United States Bankruptcy Court for the Western District of Texas approved the settlement agreements on July 16 ("2007 Compromise Orders").

On June 27, 2008, the bankruptcy court entered an order confirming the "Second Modified Amended Joint Plan of Liquidation of the Debtors"  ("Plan"). The Plan purported to "bind the Debtors and any creditor or equity holder of the Debtor, whether or not the Claim or Interest of such Creditor or equity holder is impaired under the Plan and whether or not such Creditor or equity holder has accepted the Plan."  The Plan contained the following relevant provisions– 6.9 Preservation of Rights of Action:

> [T]he Reorganized Debtors shall retain and shall have the exclusive
> right to enforce any claims, rights and causes of action that the

---

[1] The debtors are:  Lothian Oil, Inc.; Lothian Oil (USA) Inc.; Lothian Oil Texas I, Inc.; Lothian Oil Texas II, Inc.; Lothian Oil Investments I, Inc.; Lothian Oil Investments II, Inc.; and LEaD I JVGP, Inc.

[2] Belridge Group consists of:  Peninsula Fund, L.P.; Peninsula Catalyst Fund, L.P.; Peninsula Catalyst Fund (QP), L.P.; JVL Global Energy, L.P.; JVL Global Energy, (QP), L.P.; Belridge Energy Advisors, L.P.; Navitas Fund, L.P.; Paul B. Lloyd, Jr.; Michael Raleigh; and Nawab.

No. 11-51073

Debtors or the Estates may hold against any entity . . .; provided, however, that the Plan does not preclude the rights, if any, of Creditors or Interest Holders to seek authority from the Bankruptcy Court to bring claims of the Estates if not pursued by the Creditors' Committee, the Debtors or the Plan Administrator by forty-five (45) days prior to the expiration of the statute of limitations for such cause of action.

11.3 Injunction:

[A]ll Persons who . . . may be holders of Claims against or Equity Interests in the Debtors . . . shall be enjoined from taking any of the following actions against or affecting the Debtors, their Estates, and the Estate Property regarding such Claims or Equity Interests . . . to the fullest extent provided under Bankruptcy Code section 524: (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind against the Debtors, their Estates, or the Estate Property . . .; (v) proceeding in any manner and in any place whatsoever that does not conform to or comply with the provisions of the Plan.

12.1 Exclusive Bankruptcy Court Jurisdiction:

[T]he Bankruptcy Court shall retain and have such jurisdiction over the Bankruptcy Cases as is legally permissible, including . . . [t]o determine all controversies, suits and disputes that may arise in connection with the interpretation, enforcement or consummation of this Plan or any entity's obligations in connection with the Plan . . . .

On October 30, 2008, Israel Grossman and other Appellants/Cross-Appellees entered into a settlement agreement ("2008 Settlement") with Lothian releasing it of all claims in exchange for $1,025,000, but also providing that the "[c]laims . . . shall be disallowed only as to [Lothian]; to the extent not satisfied by this Agreement, the [c]laims . . . may still be asserted against any third party." The parties dispute the scope of this allowance. The bankruptcy court approved the 2008 Settlement on December 8.

On September 16, 2009, Grossman and the Anti-Lothian Bankruptcy Fraud Committee ("Anti-Lothian Committee") moved to "clarify or modify" the

4

No. 11-51073

Plan by setting aside the 2007 Compromise Orders and allegedly fraudulent property transfers ("Anti-Lothian Document").[3] The Anti-Lothian Document alleged that on April 20, 2007, Belridge Group took control of Lothian's board of directors and forced Lothian into bankruptcy. As part of the bankruptcy proceeding, Belridge Group purportedly manipulated Lothian into surrendering to Nawab—an entity created by Belridge Group to fraudulently receive the properties—the Casselman, Bohannon, Foster, Cowden, and Nobles properties without commensurate compensation.[4]

After hearing arguments on motions related to the Anti-Lothian Document, the bankruptcy court found in Lothian's favor. The bankruptcy court held that Grossman and the Anti-Lothian Committee lacked standing and that the Anti-Lothian Document was untimely because it fell outside the 180-day limitation period for revoking fraudulent plan confirmation orders. The bankruptcy court also dismissed the challenge as barred by *res judicata*, collateral estoppel, and judicial estoppel. The district court affirmed. On appeal, this court also affirmed, finding that Grossman and the Anti-Lothian Committee lacked standing. *In re Lothian Oil, Inc.*, No. 11-51082, 2013 WL 264337, at *1 (5th Cir. Jan. 23, 2013). We reasoned that "only the plan's proponents or the debtor may modify a confirmed plan" and that "[p]ermission was not sought from the bankruptcy court to bring a derivative action on the debtor's behalf." *Id.* at *3. We further agreed that the Anti-Lothian Document was untimely filed more than a year after the Plan's confirmation. *Id.* Notably, we rejected the claim

---

[3] Grossman and the Anti-Lothian Committee originally sought to set aside the Plan because of fraud. That challenge was dismissed without prejudice on September 17, 2009.

[4] Grossman and the Anti-Lothian Committee's challenge mirrored that previously brought by the "Ad Hoc Committee of Series A Preferred Convertible Shareholders," which argued that conflicts of interest required invalidation of the 2007 Compromise Orders. Settlements approved by the bankruptcy court on December 12, 2008, largely resolved the Ad Hoc Committee's challenge.

No. 11-51073

that Grossman and the Anti-Lothian Committee were trying to preserve claims against non-debtors, finding that such claims already were accounted for in the 2007 Compromise Orders. *Id.* at *3 n.5.

## B.    New York State-court Actions

### 1.    LEaD II action

On December 24, 2009, attorney Jessica Sokol, on behalf of Grossman and Lothian Cassidy, L.L.C., initiated a state-court action in New York County, New York, styled *Lothian Cassidy LLC and Israel Grossman v. Lothian Exploration and Development II, L.P.*, Index No. 09/600586 ("LEaD II action"). The complaint asserted, *inter alia*, that defendant (and non-debtor) Lothian Exploration and Development II, L.P. ("LEaD II") defaulted on payment of a $500,000 promissory note and failed to pay Grossman $1.5 million in consulting fees. It further sought constructive trusts over the Casselman, Bohannon, Foster, Cowden, and Nobles properties that allegedly were fraudulently transferred to Nawab. LEaD II, having ceased operation, did not answer, and a default judgment was entered against it on May 10, 2010. The state court referred the matter to a special referee on the issue of damages. The special referee determined that Lothian Cassidy could recover on the promissory note, but dismissed without prejudice the remaining claims for failure to join other necessary parties, including Lothian.[5]

---

[5] In January 2012, Grossman and Lothian Cassidy filed an amended verified complaint reasserting the dismissed claims and adding as defendants Lothian Energy PLC and Belridge Group. Belridge Group removed the matter to the United States District Court for the Southern District of New York, and then moved to transfer the action to the Western District of Texas. Grossman and Lothian Cassidy resisted transfer and moved to remand the action to state court. On January 28, 2013, the district court denied Grossman's motion, and granted the motion to transfer. At oral argument, the parties represented that the district court's remand and transfer orders were on appeal before the Second Circuit. The Second Circuit's docket sheet for that appeal now reflects that the Second Circuit has dismissed Grossman and Lothian Cassidy's appeal. Presumably, the LEaD II action will now be transferred to the Western District of Texas.

No. 11-51073

2.    Kings County action

On January 4, 2010, Sokol initiated a second state-court action, this time on behalf of the majority of Appellants/Cross-Appellees, in Kings County, New York, styled *Lothian Cassidy LLC v. Ransom*, Index No. 30398/09 ("Kings County action"). The Kings County complaint asserted fifteen state-law causes of action against various defendants, including former board members, officers, and representatives of Lothian. Like the LEaD II action, the Kings County action sought a constructive trust over the Casselman, Bohannon, Foster, Cowden, and Nobles properties.[6]

## C.    Enjoining the State-court Actions

On January 22, 2010, Lothian filed a motion to enforce the Plan Injunction against Grossman, the Anti-Lothian Committee, and the other plaintiffs in the LEaD II and Kings County actions (collectively, "Anti-Lothian"). The bankruptcy court held hearings on January 25 and February 11, during which it first temporarily enjoined Anti-Lothian from further litigating the state-court actions, and then found that the state-court actions violated the Plan Injunction. On February 19, Grossman filed a "Motion to Compel Compliance with December 8, 2008 Post-Liquidation Confirmation Settlement" ("Settlement Enforcement Motion"). In it, Grossman argued that the 2008 Settlement conferred an unconditional right to pursue claims against any third party. The bankruptcy court held a hearing on April 8 and denied the Settlement Enforcement Motion. Anti-Lothian responded by filing a motion for reconsideration under Rule 9024 of the Federal Rules of Bankruptcy Procedure

---

[6] The Kings County defendants subsequently removed the action to the United States District Court for the Eastern District of New York. The Kings County action then was transferred to the Western District of Texas, where it was referred to the bankruptcy court and became an adversary proceeding. The bankruptcy court entered several orders dismissing the Kings County claims, which the district court affirmed. An appeal from those dismissals is separately pending before this court, *In re Lothian Oil, Inc. (Shoshana Trust, et al., v. Ransom, et al.)*, No. 12-50462.

No. 11-51073

("Rule 9024 motion").  The bankruptcy court denied reconsideration and Anti-Lothian appealed the motion's denial to the district court.

On April 15, the bankruptcy court issued a written order finding that the state-court actions violated the Plan Injunction, and enjoining Anti-Lothian from further litigating them.  The injunction order warned that "any violation of this Order will result in a finding of contempt." On April 26, Anti-Lothian filed an appeal from the bankruptcy court's decision to enjoin the state-court actions and deny the Settlement Enforcement Motion.

## D.     Lothian's Motion for Contempt

Despite the bankruptcy court's injunctive rulings in January, February, and April 2010, Anti-Lothian continued to file numerous pleadings in the state-court actions.  In response, Lothian filed a motion seeking contempt judgments against Anti-Lothian for violations of the bankruptcy court's orders.  The bankruptcy court ordered the individuals and entities making up Anti-Lothian to appear in person to show cause why they should not be held in contempt. With the exception of Grossman—who appeared telephonically—none of them appeared at the show cause hearing.

At the end of that hearing, the bankruptcy court found Anti-Lothian in contempt of court and imposed the following sanctions: (1) a $500,000 judgment against Sokol and Grossman, jointly and severally, in Lothian's favor; (2) a $100,000 judgment against Sokol and Grossman, jointly and severally, in Belridge Group's favor; (3) a bar against recovery by Anti-Lothian of any sum from Lothian's estate until all distributions from the bankruptcy estate made after the date of the contempt judgment to all other claimants totaled $1,000,000; and (4) a $10,000 sanction against Anti-Lothian payable to the bankruptcy court for each additional action or pleading in the state-court actions.

No. 11-51073

The bankruptcy court issued a final contempt judgment on July 15, 2010. Anti-Lothian appealed the contempt judgment.

## E.    District Court Decision

On March 24, 2011, the district court dismissed as untimely Anti-Lothian's appeal from the bankruptcy court's order denying the Settlement Enforcement Motion.[7]  It then consolidated Anti-Lothian's appeal from the injunction order and the contempt judgment.

On September 30, the district court issued a memorandum opinion and order addressing the consolidated appeal and Anti-Lothian's Rule 9024 motion. Addressing the injunction order, the district court affirmed the injunction of the Kings County action because the complaint "appear[ed] to consist entirely of allegations that are derivative of an alleged injury to [Lothian]."  By contrast, the district court reversed the injunction of the LEaD II action because LEaD II was a third-party non-debtor, and Lothian did not claim an interest in any of the properties at issue.  It then reversed the contempt judgment because the bankruptcy court's decision to hold Anti-Lothian "in civil contempt as well as its calculation of the sanction amount was based in part on the erroneous finding that the LEAD II Lawsuit violated the Plan Injunction."   The district court affirmed the denial of Anti-Lothian's Rule 9024 motion.

Anti-Lothian, Belridge Group, and Lothian appeal the district court's judgment.[8]

## II.  STANDING

At the outset, Lothian challenges whether several of the Anti-Lothian claimants have standing to appeal the district court's judgment—specifically,

---

[7] In the same order the district court also dismissed as untimely Anti-Lothian's appeal from the bankruptcy court's January 2010 order preliminarily enjoining litigation of the state-court actions.

[8] Belridge Group largely adopts Lothian's arguments on appeal.

No. 11-51073

Ezrasons, Inc., Hank Cohn, David Suss, Raphael Butler, Tarshis Foundation, Ester Rosenberg Irrevocable Trust, Irving and Judith Braun, and Shira Trust. With the exception of Ezrasons, Inc.—which was enjoined by the bankruptcy court—none of the named individuals and entities is mentioned in the bankruptcy court's injunction order or contempt judgment. Anti-Lothian only responds with vague and conclusory allegations of injury. We find these insufficient to show that the listed Appellants/Cross-Appellees, with the exception of Ezrasons, Inc., have standing. *See In re Coho Energy Inc.*, 395 F.3d 198, 203 (5th Cir. 2004) ("[A]ppellant must show that he was 'directly and adversely affected pecuniarily by the order of the bankruptcy court' in order to have standing to appeal." (citation omitted)).

Lothian also challenges Jan Arnett's participation in this appeal. It appears that the district court granted Arnett's motion to dismiss his claims with prejudice in August 2011. Nevertheless, the bankruptcy court previously included Arnett in its injunction order and contempt judgment, and we hold that Arnett has standing on this basis. *See Samnorwood Indep. Sch. Dist. v. Tex. Educ. Agency*, 533 F.3d 258, 265–67 (5th Cir. 2008) (school districts collaterally constrained by injunction had standing to challenge order); *United States v. Holy Land Found. for Relief & Dev.*, 445 F.3d 771, 780–81 (5th Cir. 2006).

## III. PLAN INJUNCTION

The bankruptcy court interpreted the Plan Injunction to preclude the LEaD II and Kings County actions and enjoined Anti-Lothian from further litigating them without first seeking and obtaining its leave. We conclude that the bankruptcy court properly enjoined the state-court actions because the LEaD II and Kings County claims implicate the Plan confirmed in the bankruptcy proceeding. Further, they are derivative of an injury to Lothian and

No. 11-51073

thus are property of the bankruptcy estate that Lothian retained post-confirmation.[9]

## A.     Standard of Review

When reviewing a bankruptcy appeal from the district court, we apply "the same standard to the bankruptcy court's findings of fact and conclusions of law that the district court applied." *In re Morrison*, 555 F.3d 473, 480 (5th Cir. 2009). "That standard reviews findings of fact for clear error and conclusions of law *de novo*." *In re Lothian Oil, Inc.*, 650 F.3d 539, 542 (5th Cir. 2011). "Whether a specific cause of action belongs to a bankruptcy estate is . . . a matter of law that we decide by reference to the facial allegations in the complaint." *In re Seven Seas Petrol., Inc.*, 522 F.3d 575, 583 (5th Cir. 2008).

## B.     Derivative Claims

"The filing of a chapter 11 petition creates an estate comprised of all the debtor's property, including 'all legal or equitable interests of the debtor in property as of the commencement of the case.'" *Torch Liquidating Trust ex rel.*

---

[9] Like the district court, we are unmoved by Anti-Lothian's contention that the injunction of the state-court actions "improperly insulate[s] nondebtors" by "effectively reliev[ing] the nondebtor[s] from [their] own liability to the creditor." *In re Zale Corp.*, 62 F.3d 746, 760 (5th Cir. 1995) (internal quotation marks and citation omitted). It is beyond dispute that a bankruptcy court has "jurisdiction to interpret and enforce its own prior orders," and here the bankruptcy court determined that the state-court actions violated the terms of the Plan Injunction it approved. *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009) (citation omitted). As the bankruptcy court correctly observed "[Anti-Lothian's] contention that third-party non-debtor claims were not released in the Confirmed Plan is completely irrelevant to the analysis."

We are similarly unpersuaded by Anti-Lothian's charge that the Plan's language was insufficient to retain estate claims after the Plan's confirmation. Anti-Lothian contends that "[i]f the Debtor did not specifically disclose prospective defendants it retained the right to sue post-confirmation, the Reorganized Debtor has no standing to pursue those post-confirmation claims." While it is true that "[i]f a debtor has not made an effective reservation, the debtor has no standing to pursue a claim that the estate owned before it was dissolved," *In re United Operating, LLC*, 540 F.3d 351, 355 (5th Cir. 2008), it is not necessary that a plan individually identify the parties to be sued, *see In re MPF Holdings US LLC*, 701 F.3d 449, 455–57 (5th Cir. 2012). In any event, Anti-Lothian did not raise this argument before the district court and we have held that "[i]ssues not raised by a party seeking review in the district court are deemed waived by this court." *In re MBS Mgmt. Servs., Inc.*, 690 F.3d 352, 355 n.1 (5th Cir. 2012).

11

No. 11-51073

*Bridge Assocs. L.L.C. v. Stockstill*, 561 F.3d 377, 386 (5th Cir. 2009) (quoting 11 U.S.C. § 541(a)(1)).  The phrase "all legal and equitable interests," includes all "rights of action as bestowed by either federal or state law."  *In re S.I. Acquisition, Inc.*, 817 F.2d 1142, 1149 (5th Cir. 1987); *see In re Besing*, 981 F.2d 1488, 1493 (5th Cir. 1993).

"Whether a particular state cause of action belongs to the estate depends on whether under applicable state law the debtor could have raised the claim as of the commencement of the case."  *In re Educators Grp. Health Trust*, 25 F.3d 1281, 1284 (5th Cir. 1994).  This, in turn, requires consideration of "the nature of the injury for which relief is sought" and "the relationship between the debtor and the injury."  *Seven Seas*, 522 F.3d at 584.  If a cause of action does not explicitly or implicitly allege harm to the debtor, then the cause of action could not have been asserted by the debtor as of the commencement of the case, and will not be part of the bankruptcy estate.  *Id.*  However, "[i]f a cause of action alleges only indirect harm to a creditor (i.e., an injury which derives from harm to the debtor), and the debtor could have raised a claim for its direct injury under the applicable law, then the cause of action belongs to the estate." *Educators Grp. Health Trust*, 25 F.3d. at 1284.

In *Seven Seas* we explored whether claims by a group of bondholders constituted estate property.  The debtor in that case (Seven Seas) had retained the services of a consulting firm to provide reserve estimates for oil and gas properties, which were incorporated into a prospectus for a $110 million debt offering.  *Seven Seas*, 522 F.3d at 578.  The bondholders subsequently relied on these estimates to purchase in private transactions and on the secondary market $30 million in unsecured notes.  *Id.*  Seven Seas issued an additional $45 million in senior, secured notes, half of which were purchased by an independent oil and gas producer (Chesapeake).  *Id.* at 578–79.  After Seven Seas entered bankruptcy, the bondholders brought suit against the consulting firm for

No. 11-51073

negligent misrepresentation, fraud, violation of state securities law, and aiding and abetting fraud. *Id.* at 580. The bondholders also brought suit against Chesapeake, alleging that it knew the reserve estimates were inaccurate and entered into a conspiracy to defraud the investors of the unsecured notes. *Id.* at 581. Bondholders argued that their claims were not property of the bankruptcy estate because:

> Seven Seas could not have brought claims based on the damages that *they* suffered as a result of *their* reliance on the false reserve estimates when *they* invested in the unsecured notes, as Seven Seas simply was not harmed by misrepresentations made to the bondholders to induce them to buy (or refrain from selling) the notes on the secondary market.

*Id.* at 585.

In evaluating the bondholders' arguments, we considered "whether under state law Seven Seas could have raised the claims as of the commencement of the bankruptcy, and examine[d] the nature of the injury for which relief [was] sought." *Id.* We agreed that the bondholders "allege[d] more than an injury that [was] merely derivative of an injury to Seven Seas." *Id.* We based our conclusion on bondholders' allegations that Chesapeake knew the reserve estimates were false and used those estimates to induce bondholders to purchase or refrain from selling the unsecured notes. *Id.* at 586. This, we found, constituted a direct injury to bondholders that was independent of any injury Seven Seas suffered. *Id.* We similarly found that the bondholders' aiding-and-abetting-fraud claim alleged a direct injury because it claimed that Chesapeake assisted Seven Seas in publishing the false reserve estimates. *Id.*

Further, we expressed "doubt that, under applicable state law, Seven Seas could have raised either claim as of the commencement of the bankruptcy case." *Id.* The underlying wrong alleged in *Sevens Seas* was the making of misrepresentations on which the bondholders relied to purchase the unsecured

notes, and Seven Seas could not have been in a position to claim damages as a result of purchases made in private transactions or on the secondary market. *Id.* We concluded that "Seven Seas could not have asserted the claims as of the commencement of the bankruptcy case," and thus "these claims [were] not property of the Seven Seas bankruptcy estate." *Id.* at 587. We cautioned however, that our holding did not mean "that Seven Seas might not also have suffered its own direct injury because of some wrongdoing on the part of Chesapeake, or could not have brought any claims against Chesapeake as of the commencement of the case." *Id.* Instead, our holding was limited to finding that "the bondholders' claims and the estate's claims are not mutually exclusive: there is nothing illogical or contradictory about saying that Chesapeake might have inflicted direct injuries on both the bondholders and Seven Seas during the course of dealings that form the backdrop of both sets of claims." *Id.*

As discussed below, we find the reasoning in *Seven Seas* instructive in explaining why Anti-Lothian's state-court claims are derivative and were properly enjoined by the bankruptcy court.

## C.    State-court Actions

Anti-Lothian seeks reversal of the order enjoining their litigation of the Kings County action. Belridge Group and Lothian ask us to reverse the district court's lifting of the LEaD II injunction. Because discussion of the Kings County action illuminates our analysis of the LEaD II action, we begin our analysis with Anti-Lothian's appeal.

### a)    Kings County action

The bankruptcy court enjoined Anti-Lothian's prosecution of the Kings County action and prohibited it from "seeking relief against any of the individuals that are involved in [the bankruptcy proceeding] . . . . [for] claims against Lothian or that involve property that used to be owned by Lothian or that is currently owned by Lothian." It further stressed that Anti-Lothian could

not pursue claims "against property of Lothian that was property prepetition or that was disposed of by sales or compromises or otherwise in the [bankruptcy proceeding]. . . . [because] [t]hose are causes of action which are owned by Lothian Oil, Inc., the Debtor in this case and they're assets of the reorganized Debtor under the plan." The district court agreed that the Kings County complaint—"a bloated . . . and nearly indecipherable" document—consisted of "sweeping accusations of conspiracy, manipulation and blackmail" against "former officers, directors and agents of [Lothian], as well as [its] lead counsel and the plan administrator." It held that the Kings County complaint "consist[ed] entirely of allegations that are derivative of an alleged injury to the Debtor," which "fall squarely within the scope of the plan injunction."

Anti-Lothian disputes this characterization and argues that the injury inflicted by the Kings County defendants is independent of any injury Lothian suffered.[10] In support, Anti-Lothian primarily relies on the principle discussed in *Seven Seas*, that a bankruptcy estate and a creditor can own separate causes of action against a third party arising out of the same factual circumstances. *See* 522 F.3d at 585.

While we agree that *Seven Seas* is instructive, our holding in that case was a "narrow one." *Id.* at 587. Unlike the result reached there, here we agree with the bankruptcy and district courts that the Kings County claims are derivative of claims retained by Lothian or were disposed of in the bankruptcy proceeding.

---

[10] While Anti-Lothian raises numerous other arguments—purporting to identify as many as fourteen issues on appeal—these arguments either were not raised before the district court or are asserted in a conclusory fashion. *MBS Mgmt. Servs., Inc.*, 690 F.3d at 355 n.1; *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 356 n.7 (5th Cir. 2003) (insufficiently briefed issues are waived). As we previously observed in addressing one of Anti-Lothian's earlier appeals, "[i]t is not the function of an appellate court . . . to divine arguments on behalf of litigants from a substantial narrative; undeveloped arguments are rightly ignored." *Lothian Oil, Inc.*, 2013 WL 264337, at *4.

No. 11-51073

The Kings County complaint alleges fifteen causes of action against former officers, directors, and other individuals and entities associated with Lothian's bankruptcy proceeding.  Included among the claims are causes of action for breach of fiduciary duty, fraud, conversion, negligence, gross negligence, and conspiracy.  Distilled to its essentials, however, Anti-Lothian asserts that Belridge Group created Nawab and forced Lothian into bankruptcy.  Belridge Group then manipulated Lothian into transferring its interests in the Casselman, Bohannon, Foster, Cowden, and Nobles properties to Nawab, despite Anti-Lothian having rights in those properties.  Anti-Lothian seeks to hold Lothian's officers and directors liable for the parts they played in facilitating or allowing these transfers.

Considering first the nature of the Kings County allegations, it is clear that the problems with the Kings County claims are manifold.  Foremost among them is that Anti-Lothian's injury is contingent upon the injury Lothian suffered when it was forced to enter bankruptcy and fraudulently transfer properties it owned.  *See Educators Grp. Health Trust*, 25 F.3d at 1285–86 (court must consider the relationship between a debtor and the nature of the injury suffered).  Unlike in *Seven Seas*—where the debtor was not harmed by the alleged misrepresentations—here Anti-Lothian's allegations focus on actions taken by Lothian, before and during the bankruptcy proceeding, which the bankruptcy court later approved.  *See* 522 F.3d at 585–86.  In particular, the bankruptcy court approved settlements and auction sales that transferred the Casselman, Bohannon, Foster, Cowden, and Nobles properties to Nawab.

Importantly, Anti-Lothian did not timely challenge the Plan's confirmation.  The Kings County complaint thus is an attempt to make up for lost time: having failed to contest the Plan at its inception, Anti-Lothian now seeks to substantively undo its terms.  Those efforts trace back to the Anti-Lothian Document, which similarly sought to set aside the 2007 Compromise

No. 11-51073

Orders and the purportedly fraudulent transfers. We dismissed that challenge on numerous grounds. *Lothian Oil, Inc.*, 2013 WL 264337, at *3. In so doing, we expressly rejected Anti-Lothian's assertion that it was seeking to preserve claims against non-debtors because the 2007 Compromise Orders "covered those non-debtors as well." *Id.* at *3 n.5. We concluded with the admonition that "[d]eadlines may lead to unwelcome results, but they prompt parties to act and they produce finality." *Id.* at *4 (quoting *Taylor v. Freeland & Kronz*, 503 U.S. 638, 644 (1992)). Anti-Lothian's attempt to use the Kings County action to avoid this principle fails.

Like the Anti-Lothian Document, the Kings County action seeks to undo the 2007 Compromise Orders and property transfers. But instead of petitioning the bankruptcy court directly, Anti-Lothian seeks constructive trusts over the properties disposed of in the bankruptcy proceeding by bringing suit against individuals and entities involved in or related to that proceeding. Regardless of the merits of the Kings County claims, they cannot be divorced from the bankruptcy proceeding itself. Success in the Kings County action would grant Anti-Lothian the same relief the bankruptcy court previously denied it: unraveling of the 2007 Compromise Orders and reversal of the property transfers.

Further support for our conclusion comes from considering the causes of action asserted in the Kings County action. The Kings County complaint's central assertion is that Belridge Group manipulated Lothian into bankruptcy by taking over its board of directors and then orchestrated a fraudulent asset transfer. "We think that when such a debtor is forced into bankruptcy, it makes the most sense to consider the debtor as continuing to have a 'legal or equitable interest[]' in the property fraudulently transferred within the meaning of section 541(a)(1) of the Bankruptcy Code." *In re MortgageAmerica Corp.*, 714 F.2d 1266, 1275 (5th Cir. 1983) (alterations in original) (citation omitted); *see also In re*

17

*Moore*, 608 F.3d 253, 259 (5th Cir. 2010) (fraudulent-transfer claims are estate property under Texas law). Thus, in *Seven Seas*, we noted that while "some claims . . . are usually brought by creditors outside of bankruptcy (and thus in a sense may be said to 'belong to' the creditors and not the debtor)," we found that this is not the case where creditors "ultimately seek to recover assets of the estate that are not under the debtor's control—by reason of a fraudulent transfer, for instance, or because of the existence of separate corporate entities that are a sham." 522 F.3d at 589 (footnote omitted); *see Educators Grp. Health Trust*, 25 F.3d at 1285 (claims that defendants conspired to make debtor insolvent and commit fraudulent transfers were part of bankruptcy estate); *cf. Shandong Yinguang Chem. Indus. Joint Stock Co. v. Potter*, 607 F.3d 1029, 1036 n.4 (5th Cir. 2010) ("Neither *Seven Seas* nor *Educators* [*Group Health Trust*] . . . disturbed the additional requirement . . . that an individual claim seeking recovery or control of the debtor's property is subject to the [Bankruptcy] Code's automatic stay.").

The remaining Kings County claims also are derivative of claims retained by Lothian. For example, the Kings County complaint asserts that Lothian's officers breached their fiduciary duty by favoring Nawab and Belridge Group's interests over Lothian's. Such claims belonged to Lothian and became property of the bankruptcy estate at the commencement of the Chapter 11 bankruptcy. *See Educators Grp. Health Trust*, 25 F.3d at 1286 (finding that breach of fiduciary duty claims were part of bankruptcy estate). Other causes of action allege professional misconduct by Lothian's officers and directors before and during the bankruptcy proceeding. *See In re Southmark Corp.*, 163 F.3d 925, 931 (5th Cir. 1999) (professional malpractice claims were "inseparable from the bankruptcy context" because "[a] *sine qua non* in restructuring the debtor-creditor relationship is the court's ability to police the fiduciaries . . . who are responsible for managing the debtor's estate"). Finally, many of the Kings

No. 11-51073

County claims simply assert that the defendants were negligent or grossly negligent in their capacities as shareholders, officers, directors, or attorneys of Lothian. *See Educators Grp. Health Trust*, 25 F.3d at 1285 (claims that defendants negligently managed and conspired to negligently manage debtor belonged to bankruptcy estate). All these claims are derivative of an injury suffered by Lothian and thus were part of the bankruptcy estate that passed to Lothian under the terms of the confirmed Plan. *See Floyd v. CIBC World Markets, Inc.*, 426 B.R. 622, 636 (S.D. Tex. 2009) (claims were part of bankruptcy estate where plaintiff alleged pre-bankruptcy petition injury to debtor caused by breach of fiduciary duties, negligence, and fraud)

It thus is clear to us that the Kings County claims are derivative of an injury Lothian suffered. These claims became part of Lothian's bankruptcy estate and reverted to Lothian upon confirmation of the Plan. The bankruptcy court did not err in—and the district court correctly affirmed—enforcing the Plan Injunction to enjoin the Kings County action.

   b)   LEaD II action

As with the Kings County action, the LEaD II action raises claims largely derivative of an alleged injury to Lothian. The bankruptcy court enjoined the LEaD II action and made clear that Anti-Lothian could not bring suit against LEaD II for any cause of action that "involve[d] derivative claims or actual claims owned by Lothian." The district court reversed this part of the bankruptcy court's injunction order because it was "based on the clearly erroneous finding that the suit affected Estate Property." According to the district court, Lothian did "not contend that the Debtors or Estates held any right to the properties against which the LEaD II plaintiffs seek a constructive trust," and "[n]either [Lothian's] brief nor the Record contains any support for the conclusion that the Confirmed Plan enjoined litigation against third-party non-debtors that do not involve Estate Property."

19

No. 11-51073

Lothian argues that the district court should have affirmed the LEaD II injunction. It submits that the district court's interpretation of the Plan Injunction was overly narrow. While Lothian agrees that it no longer owns the physical properties, it contends that causes of action related to those properties became estate property that reverted to Lothian's control after the Plan's confirmation. Moreover, according to Lothian, the district court failed to appreciate that the LEaD II action—if successful—would unravel many of the bankruptcy court's orders in the bankruptcy proceeding, constituting a de facto collateral attack on the Plan's confirmation.

We agree with the bankruptcy court's decision to enjoin this proceeding. As Lothian points out, the similarities between the two complaints are striking.[11] Both the Kings County and LEaD II complaints assert claims for breach of contract, tortious interference with a contract, gross negligence, conversion, fraud, unjust enrichment, equitable and promissory estoppel, quantum meruit, specific performance, actual trust, and constructive trust. Like the Kings County complaint, the LEaD II complaint also alleges a scheme to force Lothian into bankruptcy and then transfer for insufficient remuneration properties to Nawab, an entity under Belridge Group's control. Many of the LEaD II complaint's assertions are premised on this purported scheme.

Thus, LEaD II allegedly is liable for failing to inform Anti-Lothian that Belridge Group was conspiring to consummate the fraudulent takeover of various properties. According to the LEaD II complaint, "[LEaD II] fraudulently transferred the . . . Cowden, Caselman[,] Bohannon, Foster, and Nobles prospects that it owned or that it should have assisted its partner non-party Lothian in redeeming from . . . NAWAB . . ., so that those assets could be available to satisfy its debt to [Grossman and Lothian Cassidy]." Importantly,

---

[11] We note that parts of the LEaD II complaint actually are identical to the Kings County complaint.

like the Kings County action, the LEaD II complaint alleges that the bankruptcy proceeding was deficient.     LEaD II purportedly allowed "assets to be misappropriated by the bankrupt non-party Lothian [and] then be fraudulently conveyed to [Lothian's] minority Texas shareholders [Belridge Group]."  The complaint goes on to assert that LEaD II "inten[ded] to conspire to transfer its asset[s] to the bankrupt non-party Lothian and fraudulently convey assets to its minority Texas shareholders [Belridge Group] via unfair settlements and otherwise, without notifying [Grossman and Lothian Cassidy]."

In short, the LEaD II complaint asserts that LEaD II facilitated or failed to stop the fraudulent transfer of properties in which Anti-Lothian claims an interest.  These allegations have been addressed by the bankruptcy court and implicate the bankruptcy court's orders, most notably the 2007 Compromise Orders.  Like the Kings County claims, the LEaD II claims are derivative of harm Lothian suffered—the fraudulent transfer of the Casselman, Bohannon, Foster, Cowden, and Nobles properties.

Comparing the allegations in the Kings County and LEaD II complaints confirms our decision.  Such a comparison reveals that Anti-Lothian did not substantively change its allegations between the two pleadings.  Instead, the Kings County complaint simply substituted numerous other defendants, including directors and officers of Lothian, for LEaD II.[12]  The complaint's description of LEaD II as an entity partnered with Lothian conveniently makes LEaD II subject to all the claims previously raised in the Anti-Lothian Document, which the bankruptcy court dismissed.  In so doing, Anti-Lothian assigns ownership of the various properties at issue to LEaD II and seeks to hold

---

[12] Tellingly, after the state-court-appointed special referee dismissed the majority of the LEaD II claims for failure to join other necessary parties—including Lothian—Grossman and Lothian Cassidy proceeded to file an amended complaint that added many of the parties involved in the Kings County action (but not Lothian), and thus for all intents and purposes reconstituted the Kings County action.

LEaD II liable for failing to transfer the properties to Grossman and Lothian Cassidy.

To be sure, the Kings County and LEaD II complaints are not identical. Unlike the Kings County action, the LEaD II lawsuit was brought by only two plaintiffs—Grossman and Lothian Cassidy. The LEaD II action also only was brought against LEaD II. But even these differences disguise similarities between the two complaints. Although only Grossman and Lothian Cassidy are named as plaintiffs, the LEaD II complaint also lists Shoshana Trust, Anna Meisher Pension Plan, and YG Trust as "members" of Lothian Cassidy, and includes claims arising out of loans they made to LEaD II through Lothian Cassidy. Each of these entities also is a plaintiff in the Kings County action. LEaD II itself is described as a "sister corporation" of Lothian that allegedly at one point owned in partnership with it the properties on which Anti-Lothian seeks constructive trusts. Alternatively, the complaint seeks to hold LEaD II liable because Grossman and Lothian Cassidy did business with LEaD II *through* Lothian. Ultimately, however, the LEaD II and Kings County complaints seek the same thing: transfer of title and constructive trusts over properties disposed of in the bankruptcy proceeding.

We are given pause only because interspersed with Anti-Lothian's other assertions is one claim that appears separate from the bankruptcy proceeding. The LEaD II complaint alleges that Lothian Cassidy loaned $500,000 to LEaD II, and that LEaD II defaulted on the loan. On the face of the complaint, that loan appears not to implicate the bankruptcy proceeding and is limited to LEaD II. Notably, the state-court-assigned special referee, who considered the issue of damages following LEaD II's default, also found that the promissory note claim could proceed, and awarded $759,653.47 in damages.

Nevertheless, we do not view the existence of this one potential claim among the LEaD II complaint's many other allegations as sufficient grounds to

reverse the bankruptcy court's injunction. For one, the amount owed on the promissory note is minuscule compared to the damages the complaint alleges.[13] For another, the promissory note, although mentioned in the complaint's facts, is not expressly referred to anywhere else in that document. We also note that Anti-Lothian declined the opportunity to proceed with this one claim, but asserted it as part of a much larger set of claims that, as discussed, are derivative of claims retained by Lothian. In particular, the injunction order stated that Anti-Lothian could seek and obtain leave from the bankruptcy court to institute any additional actions. Anti-Lothian points to no part of the record showing that it sought to proceed in a limited fashion on the promissory note claim. Finally, Anti-Lothian barely mentions the promissory note in its appellate brief, much less argues that Anti-Lothian should be allowed to proceed on it.[14]

Under these circumstances, we leave it to the bankruptcy court to determine the extent to which Anti-Lothian can pursue a claim independent of the bankruptcy proceeding on the basis of the promissory note. The bankruptcy court's injunction order provided as much, ordering that Anti-Lothian first seek leave from the bankruptcy court before initiating any lawsuit against various persons and entities related to Lothian's bankruptcy proceeding. The inclusion of claims that implicate the bankruptcy proceeding, and Lothian's interest in the Casselman, Bohannon, Foster, Cowden, and Nobles properties, are sufficient for us to find that the bankruptcy court properly enjoined the LEaD II action.

---

[13] By Anti-Lothian's own reckoning, they are owed $43-69 million.

[14] These circumstances distinguish this case from others in which we separated out claims belonging to a bankruptcy estate from those that independently could proceed. Thus, in *Educators Group Health Trust*, the trustee in a Chapter 7 bankruptcy proceeding filed a motion to determine which party had the authority to pursue particular causes of action asserted in a state court lawsuit. 25 F.3d at 1283. Here, by contrast, Anti-Lothian did not seek to proceed on any individual claim but challenged the bankruptcy court's authority to enjoin the state-court actions.

Resolution of the claims in the LEaD II complaint necessarily would affect Lothian and entail re-litigation of a matter the bankruptcy court already considered and rejected: the fraudulent property transfers to Nawab. Given the nature of the LEaD II complaint, we see no error in the bankruptcy court's decision to enjoin Grossman and Lothian Cassidy's litigation of that action.

## IV. Settlement Enforcement Motion

According to Grossman's Settlement Enforcement Motion, the 2008 Settlement estopped Lothian from resisting actions by Anti-Lothian against third-party non-debtors. Lothian argues that Anti-Lothian did not timely appeal denial of the Settlement Enforcement Motion. Anti-Lothian responds that its Rule 9024 motion for reconsideration extended the appeal deadline and that the district court's March 24, 2011 dismissal thus was improper.

Because Anti-Lothian's Rule 9024 motion raises the same argument as the Settlement Enforcement Motion, we address that argument here. We agree with the bankruptcy and district courts that the 2008 Settlement does not allow Anti-Lothian to ignore the Plan provisions to pursue claims like those raised in the LEaD II and Kings County actions. While the 2008 Settlement provides that Anti-Lothian's claims "may still be asserted against any third party," Anti-Lothian conflates claims it held against Lothian with claims Lothian itself held against third parties, i.e., estate claims. Put another way, Anti-Lothian was never entitled to bring the claims it now pursues in the LEaD II and Kings County actions because those are derivative claims.

Additionally, the settlement agreement nowhere provides that Anti-Lothian can bring actions on behalf of Lothian or its bankruptcy estate. It also does not exempt Anti-Lothian from the Plan Injunction. As previously mentioned, we also have rejected Anti-Lothian's attempts to retain causes of action against non-debtors. We noted that "[Anti-Lothian's] claim that [it] seek[s] to preserve claims against non-debtors . . . is meritless. The [2007]

No. 11-51073

Compromise Orders, which were recapitulated in the plan, covered those non-debtors as well; only an appeal of the confirmation order could have changed this." *Lothian Oil, Inc.*, 2013 WL 264337, at *3 n.5.

The assertion that the 2008 Settlement constitutes an additional exception to those the Plan recognized is without merit.

## V.  Contempt

After finding that Anti-Lothian repeatedly violated its injunction order, the bankruptcy court issued a contempt judgment holding Anti-Lothian in civil contempt and imposing sanctions.  The district court reversed the contempt judgment after determining that the LEaD II action should not have been enjoined.  It found that "[t]he Bankruptcy Court's finding that the LEAD II Lawsuit violated the Plan Injunction was erroneous and so any contempt judgment against appellants for prosecuting the LEAD II Lawsuit must be reversed."  It reversed the entire contempt judgment because the bankruptcy court's contempt finding and calculation of the sanctions' amount was partially based on Anti-Lothian's continued prosecution of the LEAD II action.  Because we affirm the bankruptcy court's injunction order, we similarly affirm its contempt judgment.

## A.    Contempt Power

"It is settled law that the power to punish for contempt is an inherent power of the federal courts and that it includes the power to punish violations of their own orders."  *In re Bradley*, 588 F.3d 254, 265 (5th Cir. 2009) (internal quotation marks and citation omitted).  While bankruptcy courts as non-Article III courts lack the power to impose criminal contempt sanctions for conduct committed outside the presence of the court, they retain the power to impose civil contempt under § 105 of the Bankruptcy Code.  *Id.* at 266.  "A bankruptcy court's assessment of monetary sanctions for contempt is reviewed for abuse of discretion."  *Id.* at 261.  A court "abuses its discretion if it awards sanctions

based on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Connor v. Travis Cnty.*, 209 F.3d 794, 799 (5th Cir. 2000) (internal quotation marks and citation omitted).

## B.    Contempt Judgment

We begin by observing that Anti-Lothian's conduct satisfied the elements necessary for imposing a civil contempt sanction. To hold a party in civil contempt, a court must find "(1) that a court order was in effect, . . . (2) that the order required certain conduct by the respondent, and (3) that the respondent failed to comply with the court's order." *FDIC v. LeGrand*, 43 F.3d 163, 170 (5th Cir. 1995). The bankruptcy court expressly enjoined Anti-Lothian from further litigating the LEaD II and Kings County actions. Anti-Lothian proceeded to file numerous additional pleadings in both actions in contravention of the injunction order. While it is true that "a bankruptcy court's inherent power to punish bad-faith conduct does not extend to actions in a separate state court proceeding," here the imposition of sanctions was appropriate because the state-court actions were intertwined with the bankruptcy court's orders and included issues previously resolved by the bankruptcy court.[15] *In re Case*, 937 F.2d 1014, 1023–24 (5th Cir. 1991) (reversing sanctions award where "[t]he conduct of the parties in the state action [could not] be said to affect the exercise of the judicial authority of the bankruptcy court or limit the bankruptcy court's power to control the behavior of parties and attorneys in the litigation before it").

In seeking to avoid this result, Anti-Lothian only disputes the imposition of sanctions, not the sanctions' amount. It raises two arguments rejected by the district court. First, Anti-Lothian argues that the contempt judgment was an

---

[15] Even if we accepted Anti-Lothian's contention that it was acting in good faith, this would not excuse its conduct. *See Chao v. Transocean Offshore, Inc.*, 276 F.3d 725, 728 (5th Cir. 2002) ("Good faith is not a defense to civil contempt; the question is whether the alleged contemnor complied with the court's order.").

improper criminal sanction.  Second, Anti-Lothian contends that the contempt judgment constitutes impermissible fee shifting.  Neither argument has merit.[16]

In determining whether a contempt judgment imposed a criminal or civil sanction, we consider the primary purpose for which the contempt order was entered:

> If the purpose of the sanction is to punish the contemnor and vindicate the authority of the court, the order is viewed as criminal. If the purpose of the sanction is to coerce the contemnor into compliance with a court order, or to compensate another party for the contemnor's violation, the order is considered purely civil.

*In re Bradley*, 588 F.3d at 263 (internal quotation marks and citation omitted).

Here, the bankruptcy court's contempt judgment included both remedial and coercive components.  The contempt judgment served a remedial purpose because it sought to "partially reimburse" Lothian for costs incurred as a result of the state-court actions through its imposition of a $500,000 sanction against Anti-Lothian's then-attorneys, and a $100,000 sanction in Belridge Group's favor.  The contempt judgment also served a coercive purpose by imposing a $10,000 sanction for every additional pleading in the state-court actions.  This theoretically should have persuaded Anti-Lothian to first obtain leave from the

---

[16] Anti-Lothian's other arguments are trivial.  For example, it posits that it could not be held in contempt while it was appealing the bankruptcy court's show cause order, but this is plainly wrong.  *See United States v. Cox*, 342 F.2d 167, 172 (5th Cir. 1965) (show cause order was interlocutory and not appealable); *see also In re Avante Real Estate, Inc.*, 69 F.3d 536 (5th Cir. 1995) (Table) (affirming district court's conclusion "that the Show Cause Order was not a final order and therefore not appealable, and that the bankruptcy court did not err in sanctioning [party] for [its] conduct").  Anti-Lothian also incorrectly asserts that the bankruptcy court's order was unclear and ambiguous.  Lastly, Anti-Lothian contends that actually it is Lothian's counsel who should be sanctioned.  Anti-Lothian did not appeal the district court's failure to impose sanctions on Lothian, nor is it clear that it raised this argument below.  The argument thus is waived.  *See Weaver v. Tex. Capital Bank N.A.*, 660 F.3d 900, 905 (5th Cir. 2011) ("Although an appellee may argue any ground available to support affirmance of a judgment, he may not argue for a ruling that would expand his legal rights.").

bankruptcy court before filing additional pleadings in the state-court actions. The sanctions' failure to do so does not alter the contempt judgment's civil nature.

Turning to Anti-Lothian's second argument, parties generally bear their own litigation costs. *See In re Jack/Wade Drilling, Inc.*, 258 F.3d 385, 390 n.4 (5th Cir. 2001). However, one exception to this rule is for willful disobedience of a court order. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991). Given Anti-Lothian and its attorneys' decision to ignore the injunction order, we have little difficulty in concluding that this exception applies here.

We thus hold that the bankruptcy court did not abuse its discretion in imposing sanctions on Anti-Lothian—and its former attorneys Grossman and Sokol—for continuing to prosecute the LEaD II and Kings County actions in violation of the court's injunction order.

## VI. CONCLUSION

For the aforementioned reasons, we AFFIRM in part and REVERSE in part the district court's judgment and AFFIRM in all respects the bankruptcy court's (1) injunction order enjoining litigation of the LEaD II and Kings County actions; (2) denial of the Settlement Enforcement Motion and accompanying motion for reconsideration; and (3) contempt judgment. We REMAND to the district court to remand to the bankruptcy court for the limited purpose of clarifying whether the LEaD II action's promissory note claim can proceed.

We DISMISS for lack of standing the appeals by Hank Cohn, David Suss, Raphael Butler, Tarshis Foundation, Ester Rosenberg Irrevocable Trust, Irving and Judith Braun, and Shira Trust.

Costs shall be borne by Appellants Cross-Appellees other than those listed in the preceding paragraph whose appeals have been dismissed.